**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| IN THE MATTER OF THE | ) | |
| EXTRADITION OF | ) | No.  11 M 079 |
| ROMAN ZYGMONT JAROSZ | ) | Magistrate Judge Jeffrey Cole |

## MEMORANDUM OPINION AND ORDER

## INTRODUCTION

The Government of the Republic of Poland has requested the extradition of Roman Zygamont Jarosz, pursuant to the Extradition Treaty between the United States and Poland, signed on July 10, 1996, which entered into force on September 17, 1999 (hereafter the "1996 Treaty" or "the Treaty").[1] Mr. Jarosz is charged by the Regional Prosecutor in Elblag, Poland with committing the offenses of driving while under the influence of alcohol on June 21, 2001 and causing a traffic accident that resulted in the deaths of three people and serious injury to a fourth.[2]

Article 9.3 of the Treaty requires that a request for extradition of a person "sought for prosecution" be supported by:

(a) A copy of the warrant or order of arrest, if any, issued by a judge or other competent authority;

(b) A copy of the charging document, if any; and

(c) Such information as would justify the committal for trial of the person if the offense had been committed in the Requested State.

Mr. Jarosz's sole challenge is to the sufficiency of the information submitted in support of

---

[1]Extradition  means the surrender by one nation to another, which, being competent to try and to punish him, demands the surrender. *Terlinden v. Ames,* 184 U.S. 270, 289 (1902); *Fong Yue Ting v. United States*, 149 U.S. 698, 709 (1893).

[2] Because the request for extradition was made prior to the Extradition Agreement between the United States and the European Union, that accord does not govern this proceeding.

the application for extradition, which consists, in part, of summaries of eyewitness testimony made by the prosecutor in Poland. The argument is not that the underlying eyewitness statements and other evidence are hearsay – that would be a nonstarter, for hearsay is routinely and of necessity a staple in extradition cases. *Collins v. Loisel,* 259 U.S. 309, 317(1922)(Brandeis, J.). Rather, it is that since the evidence came from the prosecutor in Poland, it is suspect and cannot constitute sufficient evidence for the required finding of probable cause that Mr. Jarosz committed the charged offenses, thereby requiring his surrender to Polish authorities.

## I.

## FACTUAL BACKGROUND

On February 16, 2011, the United States filed an initial complaint for the extradition of Mr. Jarosz at the request of the Republic of Poland and appeared in court on its behalf in accordance with Article 22 of the 1996 Treaty. A warrant was issued for Mr. Jarosz's arrest on March 3, 2011. Mr. Jarosz is wanted by Poland in connection with an automobile accident on June 21, 2001, which allegedly was caused by driving while intoxicated, resulting in the deaths of three people and serious injury of another, in violation of the Polish Criminal Code Article 177, Paragraphs 1 and 2, in conjunction with Article 178, Paragraph 1, and Article 178(a) Paragraph 1. The Regional Prosecutor in Elblag lodged these charges against Mr. Jarosz in January 2004. On February 6, 2004, upon the motion of the Regional Prosecutor, the Regional Court in Elblag, Poland issued an order for provisional detention, and on March 1, 2004, a warrant for the arrest of Mr. Jarosz was issued in case Oz 55/03.

Pursuant to 18 U.S.C. § 3184, a hearing was held to determine whether the evidence

presented by the Polish government was "sufficient to sustain the charge" under the provisions of the Treaty and consequently to "certify the same" to the Secretary of State.

## II.
## THE NATURE OF EXTRADITION PROCEEDINGS

Before addressing the specifics of Mr. Jarosz's case, it is necessary to briefly review the basis of extradition, which is grounded in international and constitutional law, and the unique nature of extradition proceedings. Neither civil nor criminal, this *sui generis,* statutorily defined proceeding has remained essentially unchanged since 1848. *See* John T. Parry, *The Lost History of International Extradition Litigation*, 43 Va. J. Int'l L. 93, 98 (2002); *United States v. Doherty*, 786 F.2d 491, 498 (2nd Cir. 1986); *In re Nava Gonzalez*, 305 F.Supp.2d 682, 689 (S.D. Tex. 2004).

From the beginning, the role of an American court in extradition proceedings has been limited. *See United States v. Kin-Hong*, 110 F.3d 103, 107 (1st Cir. 1997); *Martin v. Warden, Atlanta Penitentiary*, 993 F.2d 824, 829 (11th Cir. 1993). "[E]xtradition ultimately remains an Executive function," where the Secretary of State's decision is not generally reviewable by the courts. *Martin*, 993 F.2d at 829; *Escobedo v. United States*, 623 F.2d 1098, 1105 (5th Cir. 1980). "The non-inquiry principle serves interests of international comity by relegating to political actors the sensitive foreign policy judgments that are often involved in the question of whether to refuse an extradition request." *Hoxha v. Levi*, 465 F.3d 554, 560 (3rd Cir. 2006). Beyond simply ensuring adequate notice to the accused, courts shoulder the added burden of promoting "comity" when interpreting treaties so as to "effect the apparent intention of the parties to secure equality and reciprocity between them." *Factor v. Laubenheimer*, 290 U.S. 276, 294 (1933).

International law recognizes no inherent right of nations to extradite offenders, apart from

voluntary undertakings assumed in treaties between nation states. *Factor*, 290 U.S. at 287. The right to demand extradition and the correlative duty to surrender a fugitive to the requesting state exist only when created by treaty. *Id. See also United States v. Rauscher*, 119 U.S. 407, 411-12 (1886); *Holmes v. Jennison*, 39 U.S. 540 (1840); *United States v. Alvarez-Machain*, 504 U.S. 655, 664 (1992); John Bassett Moore, Report by Hon. J.B. Moore: Extradition §§ 9-14, vol. 1 (1890); Edward G. Clarke, A Treatise on the Law of Extradition 14 (Stevens and Haynes eds., 4th ed. 1903).

Once the extradition obligation is enumerated in a treaty that enters into force, states are bound by customary or conventional international law to fulfill the assumed obligations in good faith. *Factor*, 290 U.S. at 294. *See generally*, Vienna Convention on the Law of Treaties art. 26, May 23, 1969, 1155 U.N.T.S. 331. Contrary to the tenant of strict interpretation applicable to criminal statutes, treaties are given a "more liberal construction." *Factor*, 290 U.S. at 294; *Ramanauskas v. United States*, 526 F.3d 1111, 1114 (8th Cir. 2008); *Cucuzzella v. Keliikoa*, 638 F.2d 105, 108 (9th Cir. 1981). Still, the terms of a treaty govern its enforcement. *Medellin v. Texas,* 552 U.S. 491, 519 (2008).

Defined in 18 U.S.C. §3184, extradition in the United States involves a two-step procedure that divides responsibility for extradition between the judiciary and the executive. The judicial officer issues an arrest warrant for an individual sought for extradition, provided that there is an extradition treaty between the United States and the relevant foreign government and that the crime charged is covered by the treaty. *Fernandez v. Phillips*, 268 U.S. 311, 312 (1925); *Eain v. Wilkes*, 641 F.2d 504, 508 (7th Cir. 1981); *Kin-Hong*, 110 F.3d at 109; *In re Extradition of Rodriguez Ortiz*, 444 F.Supp.2d 876, 881-82 (N.D. Ill. 2006); *In re Extradition of Fulgencio Garcia*, 188 F.Supp.2d 921, 925 (N.D. Ill. 2002). The judicial officer then conducts a hearing to determine if "he deems

the evidence sufficient to sustain the charge under the provisions of the proper treaty." 18 U.S.C. § 3184. If that officer makes such a determination, he "shall certify" to the Secretary of State that a warrant for the surrender of the relator "may issue." 18 U.S.C. § 3184.

In practice, the executive branch conducts its own *de novo* review of the extradition case, evaluates whether the treaty requirements are satisfied, and makes the decision whether or not to grant extradition. *See Martin*, 993 F.2d at 829; *Kin-Hong*, 110 F.3d at 110; Note, *Executive Discretion in Extradition*, 62 Colum. L. Rev. 1313, 1328 (1962). The executive branch is quite properly the ultimate decision maker given its ability to deal with the unique "important, complicated, delicate and manifold problems" that are implicated in extradition decisions. *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 319 (1936). *See also United States v. Pink*, 315 U.S. 203, 229 (1942); *Guar. Trust Co. of New York v. United States*, 304 U.S. 126, 136 (1938).

In short, the Secretary of State exercises "broad discretion and may properly consider myriad factors affecting both the individual defendant as well as foreign relations, which the extradition magistrate may not." *Martin*, 993 F.2d at 829; *Hurtado v. U.S. Atty. Gen.*, 401 F. App'x. 453, 456 (11th Cir. 2010), *cert. denied*, _U.S._, 131 S. Ct. 2914 (2011). *See also Basso v. U.S. Marshal*, 278 F. App'x. 886, 887 (11th Cir. 2008); *In re Extradition of Bilanovic*, 2008 WL 5111846 (W.D. Mich. 2008).

## III.
## THE ELEMENTS OF AN EXTRADITION CASE

18 U.S.C. § 3184 enumerates the elements the government must show and the court must find in order to certify extradition to the Secretary of State: the judicial officer has jurisdiction to conduct an extradition proceeding; the court has jurisdiction over the charged person; the person

before the court is the person named in the request for extradition; there is an extradition treaty in full force and effect; the crime for which surrender is requested is covered by that treaty; and there is competent evidence to support the finding of probable cause as to the charge for which extradition is sought. But, as the Supreme Court has stressed, and as all subsequent cases have recognized, "[c]ompetent evidence to establish reasonable grounds is not necessarily evidence competent to convict." *Fernandez v. Phillips,* 268 U.S. 311, 312 (1925)(Holmes, J.).

The extradition hearing is not a trial, but rather has the character of or is "similar" to a preliminary hearing. *Bovio*, 989 F.2d at 255. *See also Benson v. McMahon,* 127 U.S. 457, 463 (1888); *David v. Attorney Gen. of U.S.*, 699 F.2d 411, 415 (7th Cir. 1983); *Peroff v. Hylton,* 563 F.2d 1099, 1102 (4th Cir. 1977); *Sayne v. Shipley,* 418 F.2d 679, 685 (5th Cir. 1969); *Merino v. Marshal,* 326 F.2d 5, 12 (9th Cir. 1964). But being *sui generis*, neither the Federal Rules of Criminal Procedure nor the Federal Rules of Evidence apply at the extradition hearing. *Bovio*, 989 F.2d at 259. In fact, the Rules exclude extradition proceedings from their ambit. *See* Fed. R. Crim. P. 1(a)(5)(A)); Fed. R. Evid. 1101(d)(3); *Mars Steel Corp. v. Continental Bank N.A.,* 880 F.3d 928, 938 (7th Cir. 1989).

A relator is not entitled to constitutional protections, including those under the confrontation clause, customarily afforded the accused in a criminal trial, and a relator has no right to discovery or to cross-examine witnesses. The Supreme Court has put it this way: "It is common in extradition cases to attempt to bring to bear all the factitious niceties of a criminal trial at common law. But it is a waste of time. For while, of course, a man is not to be sent from the country merely upon demand or surmise, yet if there is presented, even in somewhat untechnical form according to our ideas, such reasonable ground to suppose him guilty as to make it proper that he should be tried,

good faith to the demanding government requires his surrender." *Glucksman v. Henkel*, 221 U. S. 508, 512 (1911)(Holmes, J.). *See also Bingham v. Bradley*, 241 U.S. 511, 517 (1916); *Charlton v. Kelly*, 229 U.S. 447, 461 (1931);. *DeSilva v. DiLeonardi*, 181 F.3d 865, 868-69 (7th Cir. 1999); *In re Extradition of Burt*, 737 F.2d 1477, 1486 (7th Cir. 1984); *Messina v. United States*, 728 F.2d 77, 80 (2nd Cir. 1984); *Laubenheimer v. Factor,* 61 F2d 626 (7th Cir. 1932), *aff'd, Factor v. Laubenheimer,* 290 U.S. 276 (1933).

These consistently adhered-to principles ensure that the accused is not tried in the United States for crimes he is alleged to have committed in the requesting country. *Eain*, 641 F.2d at 508. Recognizing the right of the accused to have a plenary hearing and trial in the United States would compel the demanding government to produce all of its evidence on American soil, *Collins*, 259 U.S. at 316, subjecting them not only to the difficulties of an unfamiliar system but also the demands of transporting physical evidence and witnesses. *Id*. at 316; *Benson v. McMahon*, 127 U. S. 457, 461 (1888); *Ex parte Glaser*, 176 F. 702, 704 (2d Cir. 1910); *In re Wadge*, 15 F. 864, 866 (S.D.N.Y.), *aff'd,* 16 F. 332 (C.C.S.D.N.Y. 1883 ).[3] Such a result would be contrary to the desiderata of all extradition treaties.

**IV.**

---

[3] "'If this were recognized as the legal right of the accused in extradition proceedings, it would give him the option of insisting upon a full hearing and trial of his case here; and that might compel the demanding government to produce all its evidence here, both direct and rebutting, in order to meet the defense thus gathered from every quarter. The result would be that the foreign government, though entitled by the terms of the treaty to the extradition of the accused for the purpose of a trial where the crime was committed, would be compelled to go into a full trial on the merits in a foreign country, under all the disadvantages of such a situation, and could not obtain extradition until after it had procured a conviction of the accused upon a full and substantial trial here. This would be in plain contravention of the intent and meaning of the extradition treaties.'" *In re Wadge*, 15 F. at 866.

## THE STANDARD OF PROBABLE CAUSE

Section 3184 provides that the court shall certify to the Secretary of State that a surrender warrant may issue "[i]f, on such hearing, he deems the evidence sufficient to sustain the charge under the provisions of the proper treaty . . . ."  The Extradition Treaty between the United States and Poland provides, in relevant part, that the requesting state shall support its request for extradition of a person "who is sought for prosecution" with "such information as would justify the committal for trial of the person if the offense had been committed in the Requested State." Treaty, Article 9.3(c).

Common in many extradition treaties, this language limits the inquiry to whether there is evidence that would justify the relator's apprehension and commitment for trial if the crime had been committed in the district in which the hearing is conducted.  *Koskotas v. Roche*, 931 F.2d 169, 177 (1st Cir. 1991); *Hooker v. Klein*, 573 F.2d 1360, 1367 (9th Cir. 1978); *In re Extradition of Paberalius*, 2011 WL 2144065 (N.D. Ill. 2011).  This standard is essentially that of probable cause, namely whether there is "evidence sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the accused's guilt." Fed. R. Crim. P. 5.1.  A "large difference" exists between the amount of proof required to sustain a conviction and the amount of proof necessary to support probable cause.  *Brinegar v. United States*, 338 U.S. 160, 172-73 (1949).  "Probable cause . . . does not require evidence sufficient to support a conviction." *Holmes v. Village of Hoffman Estate*, 511 F.3d 673, 679 (7th Cir. 2007).  *See also Illinois v. Gates,* 462 U.S. 213, 238 (1983).  This is precisely the point made by Justice Holmes in *Fernandez v. Phillips*.  In making a probable cause determination, courts "make a practical, common sense decision whether, given all the circumstances . . . there is a fair probability that the defendant committed the crime." *In re*

*Extradition of Okeke,* 1996 WL 622213, 5 (D.N.J. 1996).

While the probable cause standard is akin to that of a preliminary hearing under Rule 5.1, the relator is, as discussed earlier, far more limited in his ability to contest evidence against him. Nevertheless, it is often said that the relator can "offer evidence that explains the requesting country's proof, but he cannot submit evidence that contradicts it." *Lindstrom v. Gilkey*, 1999 WL 342320, 5 (N.D.Ill. 1999). *See also Mainero v. Gregg,* 164 F.3d 1199, 1207 (9th Cir. 1999) ("Generally, evidence that explains away or completely obliterates probable cause is the only evidence admissible at an extradition hearing, whereas evidence that merely controverts the existence of probable cause, or raises a defense is not admissible."); *Eain*, 641 F.2d at 512 ("An accused in an extradition hearing has no right to contradict the demanding country's proof or to pose questions of credibility as in an ordinary trial, but only to offer evidence which explains or clarifies that proof"); *Messina,* 728 F.2d at 80. What precisely this means is a bit nebulous.

The relator is clearly prohibited from introducing evidence that calls into question the credibility of the witnesses, *Bovio,* 989 F.2d at 259; *DeSilva*, 125 F.3d at 1112; *Sahagian v. United States*, 864 F.2d 509, 514 (7th Cir. 1988); *Eain,* 641 F.2d at 511, merely conflicts with the evidence submitted on behalf of the demanding state, *Collins,* 259 U.S. at 315-17, attempts to establish an alibi, *Shapiro v. Ferrandina,* 478 F.2d 894, 901 (2d Cir. 1973), or suggests an affirmative defense. *Charlton,* 229 U.S. at 462. These and related issues are for the court in the requesting country to resolve in accord with its own procedures. In short, the relator cannot turn the hearing into a trial on the merits. *Bovio,* 989 F.2d at 259; *Matter of Sindona*, 450 F.Supp. 672, 685 (S.D.N.Y. 1978). The objective is far more limited. It is merely to make that practical, common-sense judgment required by probable cause principles, mindful always of the court's limited role in extradition cases

and the potential harm that may result to international relations from reflexive attempts to superimpose United States' rules of evidence on extradition hearings.

**V.**

**THE EVIDENCE SUBMITTED TO SUPPORT PROBABLE CAUSE**

In support its case for extradition, Poland has submitted extensive evidence collected from various witnesses to the collision, from experts, from medical records of tests conducted after the crash, and from others. That evidence leaves no doubt that probable cause has been established that Mr. Jarosz committed the offenses charged by the government of Poland. The evidence shows that on June 21, 2001, Mr. Jarosz, after drinking at a party, attempted to overtake several vehicles as he approached a hill. Maneuvering his blue Focus into the oncoming lane of traffic at a speed of 121 km per hour, Mr. Jarosz caused the first oncoming car to swerve to avoid him, but the second vehicle carrying the three victims was met head-on in a fatal collision. A traffic expert, who was engaged to study the collision, including examining the vehicles themselves, the scene, and reviewing witness statements, concluded that the collision was the fault of Mr. Jarosz. Other witnesses provided testimony that after he was taken to the hospital, medical officials drew Mr. Jarosz's blood in accord with proper procedures and found it to contain 1.9 per ml. of alcohol, which is drastically above the legal limit in Poland.

Janus Staniszewski was an eyewitness to the collision. He told Polish authorities that he had been behind the Fiat automobile for some time and that it was driven "according to the rules." Mr. Staniszewski related that he was about 100 meters behind the Fiat when he saw a truck in the oncoming lane, with its turn indicator on, starting to move apparently towards a parking lot. A car then started to pass the truck, when Mr. Jarosz, driving the blue Ford Focus, started to pass both

vehicles. Mr. Jarosz crossed the double line into the lane for oncoming traffic. Mr. Staniszewski saw a Mercedes minibus ahead of the Fiat swerve to avoid being hit by the Focus, but Mr. Jarosz driving at "a high speed" struck the Fiat and its three passengers.

Mr. Staniszewski described the impact, observing that both the Ford and the Fiat went "several meters in the air." He started to brake, fearful that the two cars that were rolling toward him would collide with his car, and he ended up in a ditch. After the two cars came to rest "crushed and broken," Mr. Staniszewski and another man went first to the Fiat but could not open the door. They then went to the Ford and pulled the girl out of the front seat and then removed the driver. The men then returned their attention to the Fiat. Later, the occupants of the Ford were taken from the scene by ambulance. Mr. Staniszewski said he did not notice alcohol, but was not paying attention to it. He said the driver of the Ford did not drive like a "drunken man," but drove "recklessly." He told Polish authorities that he had never seen such a terrible accident. Investigators at the scene recorded a number of circumstances, including tire marks indicating braking, and noted that at the time of the accident it was daylight, sunny, with no precipitation or fog. The road surface was a two-lane asphalt road, which was clean, smooth and in good condition.

Records show that on June 21, 2001, Mr. Jarosz was transported from the scene of the collision at about 7:43 a.m. and taken to Voivodeship Hospital arriving there at about 8:30 a.m. Hospital nurse, Leokadia Podlinska, who was questioned in 2008, did not recall specifically performing the procedure, yet she recognized a report which she signed memorializing that she drew blood from Mr. Jarosz on June 21, 2001 at about 11:12 a.m, in accord with established procedures, including being in the presence of a police officer.

Municipal Police Officer, Zenon  Rosinski,  signed the report concerning the blood draw and  confirmed his signature.   When asked in 2008, he did not remember a number of details about the events of the day, but he did recall this accident as involving the death of two nuns and a man, and he could not recall having been involved in so tragic an accident.   He also stated that he was assigned to go to the hospital to witness the drawing of blood from the man who drove the Focus, and his female passenger.  Officer Rosinski also said that the Ford driver was hostile toward him and the medical staff and that he called them names.  Officer Rosinski did not get close enough to the man to determine if there was a smell of alcohol.

Officer Rosinski recalled speaking to the female passenger (Monika Switaj, now Mrs. Jarosz), who was not drunk and cognitively knew what she was saying.  She told him that she and the driver had been at a party in Warsaw immediately before embarking on the drive, and that Mr. Jarosz had been drinking at the party.   Officer Rosinski said that he did not recall Switaj's description of the quantity of alcohol Mr. Jarosz consumed before the two of them began the trip, but he did recall that the quantity caught his attention. Officer Rosinski also recalled that the father of the driver took him from the hospital.

Under Article 115, Paragraph 15 of the Polish Criminal Code, the state of insobriety occurs when:

> 1) the alcohol content in the blood exceeds 0.5 per ml. or leads to the concentration exceeding that level, or
>
> 2) the alcohol content in 1dn3 of the exhaled air exceeds 0.25 mg. or results in the concentration exceeding that level.

The results of the analysis of the blood sample taken from Mr. Jarosz on June 21, 2001 show that the concentration of ethyl alcohol in his blood amounted to 1.9 per ml. and that there was 0.912 milligram concentration in one litre of exhaled air.

Tomasz Kowalewski, a road and traffic, expert was engaged to determine the cause of the accident. After reviewing the investigative file, he reached several conclusions which are set forth in a report dated August 16, 2001. Among Mr. Kowalewski's conclusions are: (1) the accident occurred as the Ford approached a hill, (2) the accident occurred entirely in the lane of traffic in which the Fiat was driving, (3) the Fiat was traveling at approximately 80 km per hour, (4) the Ford was traveling at about 121 km per hour; (5) none of the braking marks at the scene originated from the Ford; (6) the technical conditions of the cars "did not affect the occurrence of the event," and (7) the driver of the Ford caused the accident by his "incorrect execution of [the] overtaking maneuver" violating a number of traffic proscriptions including speeding, operating the vehicle in a state of insobriety, failing to comply with horizontal traffic lines, and overtaking on an approach to a hill. As a result of the collision, three passengers in the Fiat, Grayna Prusack, Barbara Zlotowska, and Piotr Kuklinski, the driver of the car, sustained injuries that resulted in their deaths: Injured was Monika Switaj.

Ms. Switaj provided information on May 28, 2002, almost a year after the accident. She said that she and Mr. Jarosz left Warsaw at about 3:00 a.m. and that Mr. Jarosz was driving the Ford vehicle. After sleeping for several hours, she said she was awake when the accident happened. She testified that a vehicle in front of them turned to the roadside but as they approached it, it turned back toward them and that Mr. Jarosz pulled the car to the left to avoid it and entered the oncoming lane of traffic. She said she remembered nothing after that except that they hit something and she

heard a noise. Ms. Switaj provided no information contradicting the evidence demonstrating that Mr. Jarosz was driving in a state of insobriety.

Traffic expert Tomasz Kowalewski and eyewitness Janusz Stanizewki were interviewed again in 2008. Both were provided with Ms. Switaj's May 2002 account of the event. Mr. Kowalewski said that Ms. Switaj's account was "possible but not probable." Mr. Staniszewski said it could not happen the way Ms. Switaj described it as the larger truck was pulling off and the vehicle behind it had not overtaken it when the Ford overtook both.

## VI.
## ANALYSIS

### A.
### Mr. Jarosz's Arguments Against Probable Cause

Article 9 of the Treaty is entitled "Extradition Procedures and Documents." Paragraph 1 addresses the need for submission of extradition requests through the diplomatic channel. Paragraph 2 lists the basic documents to be submitted in support of an extradition request, while Paragraphs 3 and 4 deal with information pertinent to two different circumstances: an extradition of an individual who is "sought for prosecution," *i.e.,* to stand trial on pending charges (Paragraph 3), and extradition of an individual "who has been found guilty." (Paragraph 4). Different information is required to support an extradition request under Paragraph 3 than under Paragraph 4. Paragraph 3(c) applies here. In requires that the request for extradition be supported by "such information as would justify the committal for trial of the person if the offense had been committed in the Requested State." The text of Paragraph 3(c), similar to that found in perhaps all extradition treaties, requires, at bottom, a finding of "probable cause to believe that the [defendant] committed an offense covered by the extradition treaty." *DeSilva v. DiLeonardi*, 181 F.3d 865, 1112 (7th Cir. 1999).

14

Nothing in the intentionally expansive language of Paragraph 3(c) excludes any particular type of evidence. All that is required is that the evidence causes a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the accused's guilt. *In re of Extradition of Atta*, 706 F.Supp. 1032, 1050 (E.D.N.Y. 1989). Nonetheless, Mr. Jarosz argues that the evidence is inherently unreliable because it consists largely of summaries of witness statements and medical evidence made by the prosecutor in Poland rather than a person "independent" of him. (*Response to Government's Memorandum and Complaint for Extradition* at 9-10). If it be true that "[t]he soundness of a conclusion may not infrequently be tested by its consequences," Posner, Cardozo: A Study in Reputation, 118 (1990); *see also Florida Power & Light Co. v. United States Nuclear Regulatory Commission*, 470 U.S. 729, 741 (1985), even the briefest consideration of the consequences that would flow from acceptance of the argument advanced by Mr. Jarosz reveals its unsoundness.

While Mr. Jarosz's brief does not put it this way, his argument, if accepted, would effectively create a rule of testimonial incompetence for prosecutors and automatic exclusion of their summaries of evidence. No comparable rule exists for police officers or anyone else, and the last vestiges of any rule of testimonial incompetency vanished in this country more than 150 years ago – and even then it applied only to defendants in criminal cases. *Mitchell v. United States*, 526 U.S. 314, 335 (1999); *Funk v. United States*, 290 U.S. 371, 376-77 (1933).

The rule for which Mr. Jarosz contends is incompatible with Article 10 of the Treaty, which provides, without exception for source, that documents accompanying an extradition request "shall be received and admitted as evidence" if they are certified by the principal diplomatic or consular officer of the United States resident in the Republic of Poland or are certified in any other

manner accepted by the law of the Requested State.  *See* 18 U.S.C. §3190; *Choe v. Torres*, 525 F.3d 733, 739-40 (9ᵗʰ Cir. 2008); *Bovio*, 989 F.2d at 260.

A rule that would exclude evidence merely because it stemmed from a public prosecutor rather than someone "independent" of him – who that might be the brief does not pause to explain – is incompatible with the principle that the terms of an extradition treaty should be liberally construed so as to effectuate the intention of the parties to secure the open and reciprocal surrender of fugitives to be tried for extraditable offenses.  *Factor,* 290 U. S. at 293-94.  More importantly, such a rule would have profound consequences for international relations.  Since it does not depend on a particular prosecutor's credibility  – if it did the general rule proposed by Jarosz would be unnecessary – the argument is directed and would of necessity apply to all prosecutors and would necessarily imply a disrespect for and distrust of the requesting nation's legal system.  Not surprisingly, Mr. Jarosz's brief makes no attempt to explain why public prosecutors should be singled out and their evidence deemed presumptively unreliable, while summaries by police officers and all other witnesses are regularly received in extradition hearings.

There can be no principled distinction between prosecutors and police  in this context.  Mr. Jarosz's unexplained insistence that there be a source "independent" of the prosecutor before evidentiary summaries can be deemed sufficiently reliable overlooks the undeniable symbiosis that exists between police and prosecutors and their mutual involvement in law enforcement.  Since evidence from a police officer is not presumptively unreliable,  why then should that of a prosecutor be?  Moreover, the argument for selective exclusion fails to take note of the legal and ethical constraints under which prosecutors act.  Certainly, public prosecutors, bound as they are by a demanding code of ethics, are no less credible as witnesses than police officers, whose testimony

is regularly received in extradition hearings. *See e.g.*, *Bovio, supra*; *Zanazanian v. United States*, 729 F.2d 624, 626 (9th Cir. 1984); *In re Extradition of Chan Hon-Ming*, 2006 WL 3518239, 7 (E.D.N.Y. 2006)(investigator's reports may be based on information supplied by other officers). In short, there is no basis for the asymmetrical treatment of prosecutors and police officers illogically insisted on by Mr. Jarosz's argument.

Mr. Jarosz contends that *Bovio* supports his argument that summaries of witness testimony made by a prosecutor are inherently unreliable and that the evidence must come from a source independent of the prosecutor. But *Bovio* saps the argument of any vitality. The government's evidence in *Bovio* consisted of statements by the Stockholm public prosecutor, Lars Vasthagen, and Detective Inspector Ali Lindholm of the Stockholm Police District, who had summarized the testimony of various witnesses. The Seventh Circuit rejected the argument that Detective Inspector Lindholm's summarizations were unreliable because they did not indicate how he obtained the information on which the statements were based, whether witnesses whose statements he summarized were under oath, whether there were any original notes or recordings of witness interviews, and that the evidence was entirely hearsay. 989 F.2d at 259. The Court of Appeals concluded that this evidence sufficed for a finding of probable cause and ordered Mr. Bovio extradited to Sweden for prosecution.

Mr. Jarosz misreads *Bovio* as holding that it was "crucial that the sworn hearsay submission came directly from the individual who conducted the interrogation of the witnesses regarding the events that led up to the warrant for arrest." (*Response to government's Memorandum and Complaint for Extradition* at 10). But, the opinion leaves no doubt that Inspector Lindholm's status as a police officer was irrelevant to the decision and that the result would not have been different

had the underlying information been submitted by Vasthagen rather than Lindholm.  Though the *Bovio* panel found his affidavit to have been the government's "crucial submission," it did not find, as the phrasing in Mr. Jarosz's brief suggests, that it was "crucial" that it came from Inspector Lindholm rather than the prosecutor. Its importance lay in its content, not the status or identity of its author.  In fact, the court expressly rejected *Bovio*'s argument that the submissions – one of which was the affidavit of the prosecutor –  were "inherently suspect" and concluded that the "documents submitted by the government on reconsideration were admissible." 989 F.2d  at 260.

Attention to the facts in *Bovio* further illustrates the untenability of Mr. Jarosz's argument for exclusion.  There, the underlying hearsay statements came from accomplices, whose accusations were summarized by a police officer in his submission.  259 F.2d at 257.  That the evidence was hearsay, was of no moment, for multi-level hearsay has long been routinely used in extradition hearings.  *See Collins,* 259 U.S. at 317 ("unsworn statements of absent witnesses may be acted upon by the committing magistrate, although they could not have been received by him under the law of the state on a preliminary examination."); *Kin-Hong*, 110 F.3d at 120;  *cf.* Fed.R.Crim.P. 5.1(a) ("The finding of probable cause [at a preliminary examination] may be based upon hearsay evidence in whole or in part.").  The rule could not be otherwise without obligating the requesting nation to bring its witnesses to the United States and requiring them to participate in a plenary hearing, the very thing extradition treaties are designed to prevent.

That the underlying hearsay accusations were not inherently suspect or inadmissible even though they were from accomplices was also apparent. Yet it is a commonplace that the  testimony of accomplices is viewed with great caution in light of their obvious motive to lie.  Under Mr. Jarosz's odd theory, the following illogical result would obtain: summarizations of non-accomplice

witnesses hearsay statements by a public prosecutor would be deemed inherently unreliable and automatically inadmissible, while summarizations of the hearsay statements of accomplices would be freely admissible so long as prepared by someone other than a prosecutor.[4] Of course, this makes no sense, and probable cause is, itself, a matter of common sense. *Suarez v. Town of Ogden Dunes*, *Indiana*, 581 F.3d 591, 595 (7th Cir. 2009).

Our system of criminal justice necessarily depends on "conscience and circumspection in prosecuting officers." *United States v. Dotterwich*, 320 U.S. 277, 285 (1943). Indeed, the role of the prosecutor in a criminal case is not to win but that justice shall be done. *Berger v. United States*, 295 U.S. 78, 88 (1935). Presumably, these or similar principles govern the conduct of public prosecutors in Europe and in all civilized states – and the relator's brief offers nothing to the contrary. Yet, for Mr. Jarosz, their integrity is presumptively lacking, and their summarizations of evidence so unreliable that they may not be received in an extradition proceeding, while hearsay testimony of admitted criminals is received without hesitation, so long as the summarizer is not a prosecutor. What a strange and curious inversion.

In any event, Mr. Jarosz's argument for presumptive exclusion is contrary to the decided cases – all of which his brief ignores. So long as the exhibits submitted by the requesting nation are certified and authenticated in accordance with the relevant statute, the evidence may come from a prosecutorial report. In *Choe*, 525 F.3d at 739-40, a bribery and corruption case involving a Korean police officer, prosecutor summaries of witness testimony comprised much of the evidence

---

[4] In extradition cases, the hearsay exists on at least two levels. First, is the statement of the absent declarant who prepared and submits the witness summaries. The second level is comprised of the hearsay statements of the witnesses to the prosecutor or police officer. There can even be three or more levels of hearsay. For example, a witness may recount statements made by another witness, which are then recounted to the declarant who prepares the summaries used in the extradition hearing.

submitted by the requesting state. The court found these summaries to be more than adequate basis for the magistrate to certify extradition. *Id*. at 739-40. In *Haxhiaj v. Hackman*, 528 F.3d 282, 285 (4th Cir. 2008), the government submitted a statement from Procuratore Generale Dr. Bruno Fenzia, an Italian magistrate who performs a prosecutorial function in the Italian system of criminal justice. Fenzia's statement summarized the evidence supporting Haxhiaj's conviction, including the testimony of one of the investigators as well as the results of wiretaps and physical surveillance."

In *Emami v. U.S. Dist. Court for Northern Dist. of California,* 834 F.2d 1444, 1447 (8th Cir. 1987), '[t]he factual allegations supporting the extradition request [were] based on the sworn affidavit of German prosecutor Hermann Keller. Keller's affidavit contain[ed] fifty-two pages of detailed summaries of statements made by former employees and patients of Dr. Emami." And in *In re Extradition of Harusha,* 2008 WL 1701428, 6 (E.D.Mich. 2008), the evidence that the Government (on behalf of Albania) submitted in support of extradition consisted of the affidavits of Albanian prosecutors summarizing the testimony of eyewitnesses.

Finally, there is the contention that the witnesses are "inconsistent." The argument is undeveloped, unexplained, and unsupported by any citation to the record. It is thus waived. As the Seventh Circuit has warned time and again, '[j]udges are not like pigs, hunting for truffles buried in [the record]." *United States v. Dunkel,* 927 F.2d 955, 956 (7th Cir. 1991). *See Gross v. Town of Cicero,* 619 F.3d 697, 702 (7th Cir. 2010). "A brief must make all arguments accessible to the judges, rather than ask them to play archaeologist with the record." *DeSilva v. DiLeonardi,* 181 F.3d 865, 867 (7th Cir.1999). *See also Economy Folding Box Corp. v. Anchor Frozen Foods Corp.*, 515 F.3d 718, 720-21 (7th Cir. 2008); *Sonnleitner v. York*, 304 F.3d 704, 717 (7th Cir. 2002); *Judge v. Quinn*, 612 F.3d 537, 557 (7th Cir. 2010); *United States v. Haynes*, 582 F.3d 686, 704 (7th Cir. 2009). "'[W]e

will not root through the hundreds of documents and thousands of pages that make up the record here to make his case for him.'" *Gross*., 619 F.2d at 703. And, of course, skeletal and perfunctory arguments are waived. *Dexia Credit Local v. Rogan,* 629 F.3d 612, 624-625 (7th Cir.2010); *Plan Trust Funds v. Royal Intern. Drywall and Decorating, Inc*., 493 F.3d 782, 789 (7th Cir. 2007).

Quite apart from considerations of waiver, the argument is unavailing. The credibility of the witnesses is an issue not to be resolved here. *See supra* at 9. In rejecting the claim that there was no competent evidence to support a finding of probable cause because the detective's summarization of the witnesses' statements were made five years after the investigation and there was no record of original notes from witness interviews, the court in *Bovio* said that "[s]uch arguments . . . go to credibility," and "issues of credibility are to be determined at trial." 259 F.2d at 259-260.

## CONCLUSION

The government's evidentiary submissions amply establish probable cause that Mr. Jarosz, while driving while under the influence of alcohol, caused an automobile accident that resulted in the death of three people and serious injury to a fourth in violation of the Polish Criminal Code. The evidence includes eyewitness accounts, hospital records, expert analysis and credible test results establishing a blood alcohol level drastically exceeding the legal standard for intoxication. The relator provides no legitimate reason to question the expert's conclusions, apart from erroneously contending it was formed several years after the charges against him were filed. In fact, the opinion was first propounded in August 2001. Jarosz Supp. 000011-000016.[5] With ample support from

---

[5] The expert's conclusion was updated in 2008 to address information from Monika Switaj, which was not forthcoming until after the initial report, Jarosz 80-81. If Mr. Jarosz is arguing that a court is bound only to review the adequacy of the evidence presented in the requesting country it is unpersuasive. The question for the extradition court is one of evidentiary adequacy, not evidentiary chronology. Under Mr. Jarosz's apparent
(continued...)

numerous reliable evidentiary sources, without a valid reason to question the evidence supplied, and with no legal basis that would allow me to do so in any event, I find the record sufficient to support a finding of probable cause.

Pursuant to 18 U.S.C § 3184 and the Extradition Treaty between the United States and the Republic of Poland, September 17, 1999, the Court finds that there is probable cause to extradite Roman Zygamont Jarosz to Poland. Accordingly, it is hereby ordered:

This matter is certified to the Secretary of State.

This Certificate of Extraditability and Order of Commitment, together with all formal extradition documents received into evidence, together with a certified copy of all testimony and evidence taken at hearings and all memoranda of law filed on the issue of extradition, and this and all other orders of court, shall be forwarded to the Secretary of State by the Clerk of the United States District Court for the Northern District of Illinois. Mr. Jarosz shall remain in the custody of the United States Marshal pending his surrender to the Republic of Poland, or until further order of court.

ENTERED:_____
UNITED STATES MAGISTRATE JUDGE

DATE: 7/28/11

---

(...continued)
theory, a confession that occurred in the United States after his arrival here would be inadmissible in the extradition proceeding even though it was not available to the Polish authorities at the time of the request for extradition. And, under the theory explicitly advanced, a confession by Mr. Jarosz to the prosecutor in Poland would be entirely inadmissible in the extradition proceedings.